**PARK SOUTH TENANTS CORPORATION,**
Plaintiff,

v.

**200 CENTRAL PARK SOUTH ASSOCIATES, L.P., Bernard Spitzer, Jack Lipman and Melvin D. Lipman, Defendants.**

No. 89 Civ. 8251 (WCC).

United States District Court,
S.D. New York.

Oct. 12, 1990.

As Amended Oct. 17, 1990.

Teitelbaum, Hiller, Rodman, Paden & Hibsher, P.C., New York City (Robert Hermann, of counsel), for plaintiff.

Lowenthal, Landau, Fischer & Ziegler, P.C., New York City (Robert D. Levin, Annette Ferstenberg, Jonathan Honig, of counsel), for defendant.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Plaintiff Park South Tenants Corporation brings this claim for damages, pursuant to Section 3607 of the Condominium and Cooperative Protection and Abuse Relief Act of 1980 (the "Act"), 15 U.S.C. § 3601 *et seq,* against defendants 200 Central Park South Associates (the "Sponsor") and Bernard Spitzer, Jack Lipman and Melvin D. Lipman, as individuals and as directors of plaintiff (collectively, the "Directors"). Plaintiff further bases its claim for damages on defendants' alleged breach of their fiduciary duty to plaintiff. This action is presently before the Court on defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56(c) and for plaintiff's cross-motion for partial summary judgment pursuant to Fed.R.Civ.P. 56(c).

### *Background*

On January 16, 1984, the apartment building at 200 Central Park South was converted from a rental to a cooperative. Defendant 200 Central Park South Associates, a limited partnership whose general partners are Bernard Spitzer, Ann Spitzer, Jack Lipman and Melvin D. Lipman, offered for sale the shares appurtenant to 309 residential units. According to the terms of the offering plan (the "Plan") dated May 2, 1983, which set out the details of the proposed transaction, defendant Sponsor offered for sale 310,118 of the 325,000 authorized shares of the cooperative. Complaint ¶ 5. A copy of the Plan was made available as part of the prospec-

tus package provided each potential buyer by defendant Sponsor. The Plan was declared effective on January 16, 1984 with the sale of approximately 17 percent of the apartment units in the building at closing.

One of the provisions of the Plan was a leasing arrangement whereby defendant Sponsor entered into a master commercial lease (hereinafter the "Lease") with plaintiff covering the indoor parking garage in the apartment building, two retail stores and nineteen professional offices at 200 Central Park South. Complaint, ¶ 7. The lease, as amended, is to run for fifty years from the closing, in ten five-year terms, unless terminated sooner by defendant Sponsor. It prescribes a single unapportioned rent of $400,000 per year for the first five-year term for all of the leased commercial space, increasing each term thereafter by 12 percent of any increase in operating expenses over plaintiff's actual operating expenses for the first year of the preceding five-year term.

Along with plaintiff's by-laws, section O of the Plan stipulates that there be no less than three nor more than seven directors. The Plan further provides that principals of defendant Sponsor or their designees who are in possession of shares in the cooperative that were transferred and not sold to them by defendant Sponsor ("Holders of Unsold Shares") may not elect a majority of the members of the Board of Directors, after (a) fifty percent of the outstanding shares in the cooperative have been sold to persons other than such principals or designees of defendant Sponsor, or (b) five years from the closing date, whichever should occur first. Similarly, plaintiff's governing documents reserve for defendant Sponsor the right to veto certain prescribed actions of plaintiff as long as any Holders of Unsold Shares, including defendant Sponsor, constitute at least 25 percent of the then-outstanding capital stock of the cooperative, for a period of up to five years after closing. Plaintiff, acting by the Board of Directors or otherwise and subject to the veto provisions, cannot, without the consent of the Holders of Unsold Shares, "[e]nter into any new mortgage or con-

tracts of sale or lease of the land or the building, other than as set forth in the Plan." (By-laws, Art. XII, section 2(ii)).

At the first meeting of plaintiff's shareholders, defendant Sponsor, along with defendant Directors, owned a substantial majority of plaintiff's shares and was therefore able to exercise its voting block and elect a majority of plaintiff's five directors. This situation continued until May 8, 1989 whereupon an unaffiliated Board of Directors was elected by the shareholders. Complaint ¶ 14. Defendant Sponsor was required to relinquish and thereafter did relinquish control of the board of Directors soon after January 16, 1989—five years from the date of the closing as required by the cooperative's governing documents. On or about December 12, 1989, defendant Sponsor was notified by plaintiff that, pursuant to a vote of the shareholders representing 105 of the 120 apartment units and 107,331 of the 123,820 shares entitled to vote at a special meeting held on December 5, 1989, plaintiff elected to terminate that portion of the lease pertaining to the garage, effective ninety days from the date of the notice.[1] Complaint, ¶ 19. Defendant Sponsor relinquished control of the garage as of the end of March, 1990 without protest. Since April 1, 1990, a new garage operator has been managing the premises under an agreement cancellable on thirty days notice.

Plaintiff commenced this action simultaneously with the delivery of the notice of termination on December 12, 1989 and alleges that defendant Sponsor, along with defendant Directors, interfered with plaintiff's rights under 15 U.S.C. § 3607 from the inception of the Lease. Plaintiff further claims that while the Plan, which was accepted for filing by the New York State Department of Law, disclosed the basic terms of the lease, it failed to make refer-ence to the provisions of the Act which concededly permit the termination of the lease by plaintiff and did not refer in any way to the possibility of such a termination by plaintiff or the consequences thereof. Plaintiff seeks relief in the form of damages from the defendants in an amount equal to the profits realized by defendant Sponsor through the operation of the garage from the closing [January 16, 1984] up to and including the effective date of the termination of the Garage portion of the Lease [March 13, 1990].

### Discussion

Standard for Summary Judgment

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact." Fed.R. Civ.P. 56(c); *Knight v. U.S. Fire Insurance Company*, 804 F.2d 9, 11 (2d Cir. 1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). It must establish that there is a "genuine issue for trial." *Id.* at 587, 106 S.Ct. at 1356. "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight* 804 F.2d at 11. The inquiry under a motion for summary judgment is thus the same as that under a motion for directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

---

1. At the special meeting held on December 5, 1989, shareholders representing 88 percent of the cooperative's units and 87 percent of the appurtenant shares, other than those owned by defendant Sponsor or its affiliates, voted both their shares and their units in favor of the following resolution:

RESOLVED that it is hereby determined, by the Corporation and by the shareholders rep-resenting two-thirds of the apartment units, other than the units owned by the developer-sponsor, 200 Central Park Associates, or its affiliates, to terminate so much of the commercial lease between the Corporation and the developer-sponsor dated January 16, 1984, ... directing the Secretary to give written notice of such termination to the developer-sponsor ... Complaint, ¶ 19.

party must prevail as matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).

Defendants' Motion for Summary Judgment

■ Plaintiff asserts that defendants violated 15 U.S.C. § 3607 "[f]rom the time of the Closing up to and including the effective date of the termination of the Garage portion of the Lease ..." Complaint ¶ 22. In requesting damages retroactive to the first day on which the garage portion of the Lease was executed, plaintiff argues that it was blocked from exercising its option to terminate the Lease pursuant to Section 3607 because defendant Sponsor was exercising what plaintiff terms "special developer control" from the inception of the leasing arrangement. Complaint, ¶ 22. In order for plaintiff's claim to survive defendants' motion, the Court must find that, as a matter of law; (a) plaintiff's accrual of the statutory right under Section 3607 to terminate the Lease occurred simultaneously with the execution of the Lease; and if such right accrued as of the inception of the Lease, that (b) defendants' actions from the date of closing until plaintiff's termination of the Lease frustrated the aforementioned right of termination.

*(a) Statutory Background*

The Condominium and Cooperative Protection and Abuse Relief Act of 1980 was promulgated to abate specific abusive practices occurring in the cooperative and condominium conversion process. *See* H.R. Conf. rep. No. 96–1420, 96th Cong., 2d Sess. 4 reprinted in 1980, U.S.Code Cong. & Admin.News 3506, at 3707; *see also Park East Apartments, Inc. v. 233 East 86th Street Corp.*, 139 Misc.2d 806, 529 N.Y. S.2d 674 (N.Y.Co.1988), *withdrawn*, 143

Misc.2d 60, 543 N.Y.S.2d 610 (App. Term, 1st Dept.1989). Section 3067 of the Act, in particular, was a response to the activities of many developers in the 1970's who created "sweetheart" lease arrangements and self-dealing contracts as a condition of sale. *See West 14th St. Commercial Corp. v. 5 West 14th Owners Corp.*, 815 F.2d 188, 198 (2nd Cir.), cert. denied, 484 U.S. 850, 108 S.Ct. 151, 98 L.Ed.2d 107 (1987).

The legislative history of the Act reveals the effort on the part of Congress to "assure fair and equitable principles are followed in the establishment of ... cooperative opportunities ..." 15 U.S.C. § 3601(a)(3). In order to stem the problems associated with "sweetheart" leases, the Act empowered cooperative associations with the right to cancel certain self-dealing leases or contracts during a specified window of time. *See* Cong. Record Vol. 126 (1980), Comments of Senator Stone at p. 16081. During a cooperative's formative years, the association, by vote of its membership and pursuant to the requirements of Section 3607, has the right to cancel a self-dealing contract for a reasonable period of time (two years) after "special developer control"[2] is terminated. 15 U.S.C. § 3607(b).

The Act states that a cooperative association such as Park South Tenants Corporation has the right to terminate any contract that (1) provides for operation, maintenance or management of a cooperative association in a conversion project or of property serving the cooperative unit owners in such project; (2) is between such unit owners or such association and the developer or an affiliate of the developer; (3) was entered into while such association was controlled by the developer through special developer control or because the developer held a

---

**2.** The Act defines "Special Developer Control" as:

... any right arising under State law, cooperative or condominium instruments, the association's bylaws, charter or articles of association or incorporation, or power of attorney or similar agreement, through which the developer may control or direct the unit owners' association or its executive board. A developer's right to exercise the voting share allocated

to any condominium or cooperative unit which he owns is not deemed a right of special developer control if the voting share allocated to that condominium or cooperative unit is the same voting share as would be allocated to the same condominium or cooperative unit were that unit owned by any other unit owner at that time; 15 U.S.C. § 3603(22).

majority of the votes in such association; and (4) is for a period of more than three years. 15 U.S.C. § 3607(a). All four elements must exist for a contract to be terminated under the statute. *West 14th St. Commercial Corp. v. 5 West 14th Owners Corp.*, 815 F.2d at 197. It is clear and uncontested in the instant case that defendant Sponsor's lease with plaintiff satisfies the elements enumerated above.

A termination of a contract under Section 3607(a) must be done by a vote of owners of at least two-thirds of the units other than those owned by the developer. 15 U.S.C. § 3607(c). Moreover, there is a time limit under the statute for terminating a contract. Under the provision relevant to the present case, the termination must occur within two years following the date on which control by the developer over the cooperative association is terminated or upon which the developer owns twenty-five percent or less of the units in the conversion project, whichever occurs first. 15 U.S.C. § 3607(b).[3] This two-year "window" of time during which a self-dealing contract may be terminated on the initiative of an apartment association has been enforced in past opinions of this Court. *See Elan Corporation v. Reade Street Tenants Corporation*, Civ. No. 3131 (WCC), *slip op.*, 1986 WL 13776 (S.D.N.Y. December 3, 1986); *Tudor City Place Associates and 2 Tudor Garden Parking Corp. v. 2 Tudor City Tenants Corp., et al*, 87 Civ. No. 5850 (TPG), *slip op.*, 1990 WL 63809 (S.D.N.Y. May 9, 1990); *520 East 72nd Commercial Corp. v. 520 East 72nd Owners Corp.*, 691 F.Supp. 728 (S.D.N.Y.1988). Only upon a determination that an association's rights under Section 3607 have been frustrated can the Court award damages pursuant to 15 U.S.C. § 3611.[4]

### (b) Plaintiff's Right to Terminate a Lease Under Section 3607

Plaintiff's complaint before the Court is a product of §§ 3607 and 3611. The essential question, therefore, is whether plaintiff had a right to terminate the Lease under Section 3607(a) at any time prior to January 16, 1989, the date upon which defendant Sponsor relinquished "special developer control." The clear answer is that it did not. The Court finds that Park South Tenants Corporation did not have a right to terminate the Lease with 200 Central Park South Associates pursuant to Section 3607 as of the inception of the Lease. In fact, the two-year "window" of time during which plaintiff could statutorily repudiate the Lease did not begin until defendant Sponsor relinquished "special developer control" over the cooperative soon after January 16, 1989. Just as the Court in *Elan* did not extend the two-year time period during which a cooperative could exercise its right to terminate a self-dealing contract, the Act does not give the Court the option to "open" such window at any point before (a) special developer control over the association is relinquished or (b) the developer owns 25% or less of the units in the conversion project.[5]

---

3. The operative provisions of the Act read:
   Any termination under this section may occur only during the two-year period beginning on the date on which—
   (1) special developer control over the association is terminated; or
   (2) the developer owns twenty-five percentum or less of the units in the conversion project, whichever occurs first. 15 U.S.C. Section 3607(b)

4. 15 U.S.C. § 3611 provides in relevant part:
   *Additional Remedies*
   **Suits at law or equity**
   (a) Unless otherwise limited as in section 3607 or 3608 of this title, any person aggrieved by a violation of this chapter may sue at law or in equity.
   **Recovery of actual damages**
   (b) In any action authorized by this section for a violation of section 3607 or 3609 of this title where actual damages have been suffered, such damages may be awarded or such other relief granted as deemed fair, just, and equitable . . .

5. It should be further noted that Congress did not empower the courts through Section 3607 to declare unconscionable leases void *ab initio* as it did in Section 3608. Rather, Congress provided apartment associations, through the enactment of Section 3607, the option to terminate an allegedly self-dealing lease with a cooperative sponsor within a specified window of time and without judicial intervention. Absent specific pleading, plaintiff may not take advantage of the remedial provisions of a Section 3608 nullification in a Section 3607 termination. Accord-

The Court can find no basis for plaintiff's claim that its rights under Section 3607 were violated by the execution of the Lease or defendant Sponsor's "continuing exercise of the special developer control," complaint, ¶ 22, where Congress has explicitly laid out a timetable pursuant to which an actionable claim under Section 3607 may be initiated. *See Brabert Realty Co. v. 20125 Owners Corp.*, 703 F.Supp. 314 (S.D.N.Y.1989) (the termination of a lease entered into while the cooperative association was controlled by a former owner-developer is timely if done within two years of the end of special developer control). Given the facts at hand, the Court disagrees with plaintiff's submission in its memorandum of law in opposition to defendants' summary judgment motion that,

> where a developer imposes on a cooperative a garage lease which the cooperative would have the right and ability to terminate but for the fact that the developer arrogated to itself special powers both to control the governance of the cooperative and to block the cooperative from executing any other garage lease, the developer is liable in damages for the revenues the cooperative lost. Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, p. 7.

The "control" exercised by defendant Sponsor over plaintiff, as spelled out in the cooperative's governing documents, was of the nature contemplated by the statute. While it is evident that defendant Sponsor's right to vote the unit shares appurtenant to the unsold apartments in the cooperative did not constitute extraordinary control, the veto power accorded defendant Sponsor by the governing documents over such items as capital improvements, employee hiring, repairs, refinancing, augmentation of the reserve fund, provision of services, equipment procurement, and building leases falls within the Act's definition of "special developer control" noted above. Accordingly, the Court will not place liability upon defendants for the defendant Spon-

sor's exercise of control over the coop at a level contemplated by federal statute and, more importantly, not in conflict with any of plaintiff's statutory rights. Only upon defendant Sponsor's surrender of such control would plaintiff's right of termination under Section 3607 have accrued—and only upon interference therewith, could a violation be alleged.

Liability can attach to defendants for damages under the "[a]dditional remedies" provision of Section 3611(a) only if defendants frustrated plaintiff's efforts to terminate the Lease. A "violation" of plaintiff's rights under the nonjudicial termination procedure set out in Section 3607 exists only when a defendant's behavior impedes the legitimate actions of a plaintiff undertaken as of right according to federal statute. Plaintiff asserts that such a position would lead to "results clearly contrary to the goals and requirements of the Act." Plaintiff's Memorandum, p. 15. The Court disagrees. Reflecting upon the language of the Act itself, *see Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 110, 103 S.Ct. 986, 990, 74 L.Ed.2d 845 (1983), and the purposes Congress sought to serve by its promulgation, *United States v. Matteo*, 718 F.2d 340, 341 (2d Cir.1983), it is clear that Congress did not intend to provide plaintiffs, such as the one presently before the Court, with the option of terminating a contract with a developer outside the specified two-year period. 15 U.S.C. § 3607(b).

By delaying the attachment of a cooperative's right to terminate a self-dealing contract until the occurrence of either the developer's relinquishment of control over the cooperative or the developer owning less than 25% or less of the units in the project, Congress recognized (a) that such leases enabled association members to purchase into the cooperative at substantially lower prices, *see Elan Corporation v. Reade Street Tenants Corporation*, Civ. No. 3131 (WCC), *slip op.* (S.D.N.Y. December 3, 1986), and (b) that at the nascent stages of the conversion, the sponsor would bear

---

ingly, the Court does not consider the granting of "additional remedies" under Section 3611 to

be appropriate in the instance where no right under Section 3607 was violated.

much of the cost of these self-dealing arrangements to the extent that they owned a majority percentage of unsold units. To the first point, the Court takes note of the legislative history of 15 U.S.C. § 3608 [6] wherein:

... the [Congressional] Committee recognized the arguments of developers that, in some circumstances, the leases enabled units to be marketed at substantially lower prices and provided a significant portion of the builder's profit in the project as a whole. Therefore, the Committee has specifically directed the courts to focus on these and other considerations in determining whether a lease should be adjudged unconscionable due to a gross disparity between the obligation incurred and the value received by the lessees. P.L. 96–399, 1980 U.S.Code Cong. and Admin.News, at 3559.

This Court does not take issue with plaintiff's right under Section 3607 to terminate a lease between itself and defendant Sponsor. The Court is cognizant of the underhanded practices of many parties to transactions such as the one before the Court in which developers attempt to reap enormous profits from cooperative owners through "sweetheart" leases and self-dealing service arrangements. *520 East 72nd Commercial Corp. v. 520 East 72nd Owners Corp.*, 691 F.Supp. at 730 (S.D.N.Y.1988). However, Section 3611 was intended to provide damages only for interference with a cooperative's right to terminate a contract under Section 3607. Defendants were respectful of plaintiff's rights under Section 3607 and there was no interference with such rights. Defendant Sponsor did not dispute plaintiff's notice of termination and yielded to plaintiff's demands without contest. Accordingly, the Court grants defendants' motion for summary judgment on the claim under Sections 3607 and 3611.

*Defendants' Fiduciary Duty to Plaintiff*

■ Because defendants' motion for summary judgment is granted, this Court no longer has pendent subject matter jurisdiction over plaintiff's state law claim for breach of fiduciary duty. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The Court finds no diversity or other independent basis of jurisdiction to entertain such claim. Had the Court concluded that plaintiff's claim under Section 3607 was legitimate, it would be obliged to accept jurisdiction over the state law fiduciary claims. *W. 14th St. Commercial Corp. v. 5 W. 14th Owners Corp.*, 815 F.2d at 193 (2nd Cir.1987). However, as noted, that is not the case here. Accordingly, plaintiff's state claim for breach of fiduciary duty is dismissed.

### CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted as to the claim made under the Condominium and Cooperative Protection and Abuse Relief Act of 1980. The pendent state law claim is dismissed for lack of jurisdiction. This action is accordingly dismissed.

SO ORDERED.

---

**6.** The Court recognizes the distinction between Sections 3607 and 3608. The reference made here to the legislative history of the latter serves as a means of gaining some perspective and insight into the development of the Act and the intention of Congress at the time of its passage.